**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X   **Docket No.**
CORETTA RODDEY,

Plaintiff,

-against-

KPMG, LLP, SABRINA DONNELLY, *In Her Individual And Official Capacities*, JONATHAN EDGERTON *In His Individual and Official Capacities,* JULIE MOLITOR, *In Her Individual And Official Capacities,* JONATHAN WYATT, *In His Individual And Official Capacities,* YVONNE GARCIA, *In Her Individual And Official Capacities,* TIMOTHY PHELPS*, In His Individual And Official Capacities,* and ALLISON SUMROW*, In Her Individual And Official Capacities,*

Defendants.

-----------------------------------------------------------------X

        **<u>COMPLAINT</u>**

        ***<u>PLAINTIFF DEMANDS</u>***
        ***<u>A TRIAL BY JURY</u>***

      PLAINTIFF CORETTA RODDEY, by her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC., hereby complains of the DEFENDANTS, upon information and belief, as follows:

<u>NATURE OF THE CASE</u>

1.      PLAINTIFF complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, <u>42 U.S.C.</u> §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) (Title VII); <u>42 U.S.C.</u> § 1981, the <u>New York State Human Rights Law</u>, <u>New York State Executive Law</u> §296, *et. seq.* ("NYSHRL"), and the <u>New York City Human Rights Law</u>, §§ 8-107 *et seq.* ("NYCHRL"), and seeks damages to redress the injuries PLAINTIFF suffered as a result of being **<u>discriminated against</u>** on the basis of her **race/color (African American/Black)** and then **retaliated against** and **<u>wrongfully terminated</u>** by her employer DEFENDANT KPMG for engaging in protected activity.

1

2.      In public, **DEFENDANT KPMG** boasts that it (allegedly) champions diversity and inclusion in its workplace and claims that "*KPMG's commitment to Diversity and Inclusion is a strategic imperative and is rooted in [KPMG'S] vision to have a diverse workforce in which its professionals can reach their fullest potential in an inclusive work environment.*" (*See,* https://www.kpmg.us/about/diversity-equity-inclusion.html).

3.      However, KPMG's actual practices within its offices and workforce demonstrates that KPMG's purported dedication to a diverse workforce is merely lip service and KPMG has no real interest or intent on diversifying its workforce.

4.      Indeed, KPMG's treatment of PLAINTIFF RODDEY demonstrates that KPMG: **[1]** does not want to put a "Black face" on any of it projects in leading/management roles, **[2]** actively subjugates and hides African American managers from KPMG's projects and clients, or places them in projects concerning racial issues, and **[3]** immediately retaliates against minority employees (such as PLAINTIFF herein), who raise concerns about diversity and inclusion at KPMG.

5.      PLAINTIFF CORETTA RODDEY was employed by Defendant KPMG as a Manager, Transformational Delivery in Consulting from September 16, 2021 until she was wrongfully terminated on January 28, 2022.

6.      Prior to her wrongful termination, PLAINTIFF RODDEY was recently hired to KPMG for the management position and noticed that she was not being afforded equal opportunities and occasion to train and/or to receive equal/fair assignments in her new role. After noticing that her similarly situated non-African American coworkers were receiving assignments and support unlike PLAINTIFF, PLAINTIFF raised concerns to KPMG'S Human Resources Department and Diversity and Inclusion office.

7.      PLAINTIFF did not ask for anything above and beyond what her coworkers received at

KPMG. PLAINTIFF merely asked for a fair chance and for equal opportunity.

8.   Immediately upon raising concerns and pleading with KPMG DEFENDANTS for equal opportunity, PLAINTIFF was immediately blacklisted within KPMG, further prevented from equal employment opportunities and immediately terminated without affording PLAINTIFF any chance to demonstrate her professional abilities, whatsoever.

9.   **PLAINTIFF was humiliated and wrongfully terminated <u>within a month</u> of merely raising concerns about equal treatment <u>and within one day</u> after KPMG concluded its investigation into PLAINTIFF'S complaint.**

10.  Clearly, PLAINTIFF was immediately retaliated against and terminated for engaging in protected activity. KPMG'S outrageous and swift retaliatory actions against African American PLAINTIFF demonstrates that KPMG engages in conduct designed to instill fear in minorities that complain to specifically prevent complaints about discrimination and stymie diversity at KPMG.

11.  PLAINTIFF was a victim of a company (*i.e.* KPMG) that merely speaks diversity in public while engaging in discriminatory and retaliatory practices in private – to the detriment of African American PLAINTIFF and in violation of the statutes asserted herein.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

12.  Jurisdiction of this Court is proper under <u>42 U.S.C.</u> §2000e-5(f)(3), and <u>28 U.S.C.</u> §§1331 and 1343.

13.  The Court has supplemental jurisdiction over the claims of Plaintiff brought under State and City law pursuant to <u>28 U.S.C.</u> §1367.

14.  Venue is proper in the Southern District of New York pursuant to <u>28 U.S.C.</u> §1391(b), as the acts complained of occurred therein, in New York, New York.

15.    By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on 3/11/2022; (b) receiving a Notice of Right to Sue from the EEOC on 6/3/2022; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, PLAINTIFF has satisfied all of the procedural prerequisites for the commencement of the instant action.

16.    A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

17.    A copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## PARTIES

18.    **PLAINTIFF CORETTA RODDEY (hereinafter "PLAINTIFF RODDEY")** is an African American female, military veteran, who was employed at KPMG as a Manager, Transformational Delivery in Consulting from September 16, 2021 until she was wrongfully terminated on January 28, 2022.

19.    **KPMG, LLC. (*a/k/a*, KLYNVELD PEAT MARWICK GOERDELER), (hereinafter "DEFENDANT KPMG")** is an international financial services firm, incorporated in the United Kingdom and headquartered in the Netherlands, but doing business in the United States, including New York. KPMG is a network of firms in 145 countries, with over 236,000 employees and has three main lines of services: financial auditing, tax, and financial advisory.

20.    **DEFENDANT SABRINA DONNELLY (hereinafter "DEFENDANT DONNELLY")** is a Financial Services Resource Manager at DEFENDANT KPMG. In her role,

DEFENDANT DONNELLY was PLAINTIFF'S manager and was able to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT DONNELLY is being sued herein in her individual and official capacities.

21.   **DEFENDANT JONATHAN EDGERTON (hereinafter "DEFENDANT EDGERTON")** is a Principal of Operations & Compliance Risk at DEFENDANT KPMG. DEFENDANT EDGERTON was able to affect the terms and conditions of PLAINTIFF'S employment and is being sued herein in his individual and official capacities.

22.   Upon information and belief, **DEFENDANT JULIE MOLITOR (hereinafter "DEFENDANT MOLITOR")** is a Human Resources Manager and/or Representative at KPMG. DEFENDANT MOLITOR had the ability to affect the terms and conditions of PLAINTIFF'S employment and is being sued herein in her individual and official capacities.

23.   **DEFENDANT JONATHAN WYATT (hereinafter "DEFENDANT WYATT")** is a Managing Director of Human Resources at KPMG. DEFENDANT WYATT had the ability to affect the terms and conditions of PLAINTIFF'S employment and is being sued herein in his individual and official capacities.

24.   **DEFENDANT YVONNE GARCIA (hereinafter "DEFENDANT GARCIA")** is a manager and/or In-House Counsel at KPMG. DEFENDANT GARCIA was involved in an investigation that took place following a complaint made by PLAINTIFF and was directly involved in PLAINTIFF'S subsequent termination. DEFENDANT GARCIA is being sued herein in her individual and official capacities.

25.   **DEFENDANT TIMOTHY PHELPS (hereinafter "DEFENDANT PHELPS")** is a Partner in DEFENDANT KPMG's Department of Professional Practice (DPP).

DEFENDANT PHELPS is a manager that had the ability to affect the terms and conditions of PLAINTIFF'S employment and was responsible for the termination of PLAINTIFF. DEFENDANT PHELPS is being sued herein in his individual and official capacities.

26. **DEFENDANT ALLISON SUMROW (hereinafter "DEFENDANT SUMROW")** is a Financial Services Resource Manager at DEFENDANT KPMG. In her role, DEFENDANT SUMROW was one of PLAINTIFF'S managers and was able to affect the terms and conditions of PLAINTIFF'S employment. DEFENDANT SUMROW is being sued herein in her individual and official capacities.

27. **DEFENDANTS, DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, PHELPS, and SUMROW**, are collectively referred to herein as "**INDIVIDUAL DEFENDANTS**."

28. **DEFENDANTS, KPMG, DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, PHELPS, and SUMROW**, are collectively referred to herein as "**KPMG DEFENDANTS**."

## MATERIAL FACTS

29. PLAINTIFF RODDEY was hired by KPMG as a Manager of Transformational Delivery and Consulting on or about September 16, 2021.

30. PLAINTIFF was qualified for her position/employment and would have performed her duties in a satisfactory manner if she was given a fair opportunity (as described below).

31. PLAINTIFF was not disciplined as an employee at KPMG until she complained about discrimination, retaliation and unequal treatment in the KPMG workplace. Only then was PLAINTIFF subject to adverse employment actions, disciplinary actions, and summary termination as described in detail below.

32.    On or about September 27, 2021, PLAINTIFF began working at KPMG in the Transformation Delivery **("TD")** Program, in the Portfolio Management Area as a Manager of Transformational Delivery and Consulting.

33.    Pursuant to her role, PLAINTIFF possessed a PMP designation and was pursuing a Financial Services Industry Designation with FINRA.

34.    PLAINTIFF'S duties and responsibilities in her role included leading and supporting business development activities, proposal development, developing and delivering advisory methodologies, developing relationships with directors, vice presidents and executives, crafting and developing C-level communications, leading the KPMG team in delivery of services and supporting customers, among other things.

35.    Though the above were tasks that PLAINTIFF was advised she would be involved with, PLAINTIFF was never given an opportunity (fair, reasonable or otherwise) to perform any functions of her role, as described in detail below.

36.    On or about October 7, 2021, PLAINTIFF had an initial meeting with DEFENDANT DONNELLY who stated that PLAINTIFF was being proposed by KPMG for a project known as "Stifel," which was a staff augmentation siloed role that was located in St. Louis Missouri.

37.    PLAINTIFF was initially informed by DEFENDANT DONNELLY that the project would be based in St. Louis Missouri, which meant that PLAINTIFF would have to travel to the area.

38.    PLAINTIFF was concerned about being made to travel to St. Louis at this particular time, as there were ongoing riots (related to police brutality following the death of George Floyd at the hands of St. Louis Police) happening in the area and the National Guard had to be deployed to the area to control the unrest.

39.     PLAINTIFF advised DEFENDANT DONNELLY that PLAINTIFF was concerned about the particular assignment because of the ongoing riots and safety concerns.

40.     During this initial call with DEFENDANT DONNELLY, Plaintiff asked DEFENDANT DONNELLY if DONNELLEY could speak with DEFENDANT EDGERTON about the assignment due to the physical dangers associated therewith.

41.     When DEFENDANT DONNELLY did not address PLAINTIFF'S concerns, PLAINTIFF contacted DEFENDANT EDGERTON herself.

42.     PLAINTIFF received no response from either DEFENDANTS DONNELLY or EDGERTON.

43.     PLAINTIFF then reached out to Head of Consulting Practice – Carl Carande -  and expressed concerns about how she was being proposed on assignments and the lack of transparency that existed with the Resource Manager SABRINA DONNELLY AND SUMROW.

44.     In an email with Mr. Carande, PLAINTIFF raised several concerns. PLAINTIFF questioned how resources are allocated within KPMG'S Management Consultant Practice and complained about the apparent  lack of transparency between resource managers when PLAINTIFF was trying to be considered for potential project opportunities.

45.     PLAINTIFF also expressed concerns that, because the assignment was a siloed and a staff augmentation role for the client, PLAINTIFF would be inhibited from meeting certain performance goals that were set for her management role.

46.     Nevertheless, DEFENDANT EDGERTON still sent an introduction email to the Managing Director of the potential assignment and ignored PLAINTIFF'S concerns.

47.     PLAINTIFF did not state that she did not want to be aligned with the Stifel project, but

raised concerns about the fact that the project was situated in St. Louis Missouri, where there were ongoing racial tensions at the time.

48.    When PLAINTIFF simply questioned whether DEFENDANTS believed that the Stifel project was a good fit for her given the ongoing protests and riots, DEFENDANTS ignored PLAINTIFF'S concerns.

49.    PLAINTIFF then spoke to the managing director about the same concerns.

51.    During discussions with the managing director, PLAINTIFF learned that the project required a person, who was a subject matter expert in governance risk compliance software implementation, which PLAINTIFF was not.

50.    DEFENDANT DONNELLY also claimed that PLAINTIFF had been submitted by KPMG to manage KPMG'S Goldman Sachs & American Express ("Amex") accounts.

51.    However, PLAINTIFF then reached out to the Resource Manager named Leslie, who managed the Goldman Sachs account, and learned that PLAINTIFF'S profile was never even presented by DEFENDANTS, DONNELLY or KPMG, to be submitted to the Goldman Sachs opportunity.

52.    On or about the next day, October 8, 2021, when PLAINTIFF followed up with DEFENDANT DONNELLY about the Amex account, DEFENDANT DONNELLY alleged that Amex did not have a need for PLAINTIFF.

53.    However, PLAINTIFF also learned that DEFENDANT DONNELLY did not actually propose PLAINTIFF for the Amex account as she (falsely) promised.

54.    PLAINTIFF began to feel concerned that she was being kept from, or prevented from, assignments by DEFENDANT DONNELLY. As a result, PLAINTIFF was idle.

55.    PLAINTIFF began observing her similarly situated managers, none of whom were African American, and realized that the other managers were being supported and

positioned into account management roles.

56.     DEFENDANTS, DONNELLY and KPMG, were treating PLAINTIFF differently from the outset due to her race.

57.     Concerned, and in an effort to demonstrate to KPMG that she wanted opportunities to work on accounts like her comparator managers, and was making active efforts for assignments, on or about October 8, 2021, PLAINTIFF began to send personal introduction emails as a new hire to various partners and managing directors at KPMG.

58.     Specifically, PLAINTIFF began expressing her interest, making herself visible as a new employee and requesting to get involved in potential business development initiatives or engagements.

59.     On or about October 8, 2021, PLAINTIFF sent an introduction email to KPMG employee Carl Carande – Head of Advisory Services. PLAINTIFF received no response.

60.     On or about October 12, 2021, PLAINTIFF sent an introductory email to People Manager – "Shane Doe" regarding resource allocation questions as PLAINTIFF was trying to figure out how managers are assigned work.

61.     None of PLAINTIFF'S similarly situated coworkers had to go through the same practice. Indeed, everyone else was being supported and placed in/with various accounts without having to actively sell themselves like PLAINTIFF.

62.     However, PLAINTIFF'S efforts were being met with no responses.

63.     PLAINTIFF actively stayed in touch with her assigned PML (Professional Management Lead) who also promised to help her get engaged and bring her in on business development opportunities with Transformation Delivery.

64.     Also, on October 12, 2021, PLAINTIFF, now concerned about her lack of involvement and assignments, sent an email to touch base with Scott Kline ("Mr. Kline") (KPMG

Transitional Coach) to request a meeting.

65. No guidance was received from Mr. Kline, except that PLAINTIFF was instructed to *"wait until [she is] assigned and don't worry."*

66. PLAINTIFF understood this to mean that she could not actively cause herself to be assigned to accounts/projects and that KPMG'S management, including DEFENDANT DONNELLY, had to choose and assign PLAINTIFF for projects.

67. Yet, this did not stop PLAINTIFF from taking initiative and actively trying to make herself known because PLAINTIFF did not know what else to do.

68. PLAINTIFF maintains evidence of many emails where she tried to reach-out to KPMG managers to introduce herself and to ask for opportunities to join projects. PLAINTIFF remained proactive in trying to get a fair chance at KPMG.

69. On or about October 13, 2021, PLAINTIFF sent an email to KPMG'S Head of Advisory Services Carl Carande regarding resource allocation questions.

70. On or about October 13, 2021, PLAINTIFF sent an email to DEFENDANT EDGERTON requesting a meeting to find out DEFENDANTS' response to PLAINTIFF'S concerns about the Stifel project.

71. Also, or about October 13, 2021, PLAINTIFF, continuing to be proactive, resent her personal email introduction to KPMG'S **Financial Services ("FS")** Partners and Managing Directors requesting to get involved in FS initiatives and also inquired where she could help KPMG based on her skills and experience in within management consulting and the financial services industry.

72. But once again, PLAINTIFF received no responses.

73. No other similarly situated non-African American manager had to go through this same process for recognition or assignments.

74.     Then, or about October 13, 2021, PLAINTIFF sent another email to the Head of Advisory Services (Carl Carande) after PLAINTIFF received an advisory All Hands Call & Request to get involved in internal firm initiatives, which was announced during the meeting regarding "One Firm GTM."

75.     On or about October 14, 2021, PLAINTIFF finally received a response from DEFENDANT EDGERTON, wherein he asked for a meeting with PLAINTIFF after she reached out to Carl Carande, who forwarded PLAINTIFF'S email to DEFENDANT EDGERTON.

76.     During the meeting DEFENDANT EDGERTON subtly reprimanded PLAINTIFF for reaching out to Carl Carande and told PLAINTIFF that she should not have done so.

77.     PLAINTIFF explained that, as she was being left in the dark and kept away from assignments and accounts, PLAINTIFF became worried and wanted to be proactive.

78.     PLAINTIFF and DEFENDANT EDGERTON also talked about the Stifel project and the fact that the engagement would have been "siloed" or assigned as the only Transformation Delivery Resources project with no team to manage in a staff augmentation role.

79.     Also, PLAINTIFF was concerned that the Managing Director over the Stifel account confirmed the client was seeking global risk compliance experience and that the project was a "*troubled project, which had not been successful after 1 year.*"

80.     As such, the only role/assignment offered to PLAINTIFF was one wherein PLAINTIFF would be placed in a dangerous area, in a problematic project, wherein PLAINTIFF would not manage a team like other projects and managers.

81.     In or around this time, PLAINTIFF raised concerns to DEFENDANT ALLISON SUMROW, another Resource Manager at DEFENDANT KPMG.

82.     Specifically, PLAINTIFF complained to DEFENDANT SUMROW that PLAINTIFF "*was the only African American female*" manager in TD Financial Services based in New York and wanted "*to be treated fairly*" with the "*same opportunities given to other managers*."

83.     PLAINTIFF was sure to advise DEFENDANT SUMROW that her treatment at KPMG appeared to be "*biased*."

84.     DEFENDANT SUMROW received this concern/complaint from PLAINTIFF and did nothing.

85.     DEFENDANT SUMROW did not forward PLAINTIFF'S concerns to HR or anyone else charged with the responsibility of addressing discrimination complaints.

86.     Instead, DEFENDANT SUMROW joined-in with the other Resource Manager DEFENDANTS to stymie PLAINTIFF'S complaint and future professional opportunities at KPMG.

87.     Specifically, DEFENDANT SUMROW falsely told PLAINTIFF that PLAINTIFF was being presented and submitted for available opportunities in Financial Services (such as Goldman Sachs and American Express), while no such submissions were being made.

88.     Indeed, the Resource Managers, knowing that PLAINTIFF would never be given opportunities and would be terminated due to her complaints, continued to present PLAINTIFF with false hope, while intentionally keeping PLAINTIFF away from Financial Services projects.

89.     On or about October 14, 2021, PLAINTIFF received a catch up meeting request from HR Business Partner - Betty Purcell to see how PLAINTIFF'S on-boarding was going.

90.     During this call PLAINTIFF expressed frustrations about: [1] being kept in the dark within the department, [2] not being given any assignments, unlike her similarly situated

coworkers, [3] not being utilized for available accounts/projects, and [4] the Resource Managers (such as DEFENDANT DONNELLY) not being transparent about being assigned to clients and projects.

91. On or about October 14, 2021, PLAINTIFF reached out to HR to raise concerns about her treatment and was directed to TD's HR Representative, DEFENDANT JULIE MOLITOR.

92. PLAINTIFF then reached out to DEFENDANT MOLITOR and requested a meeting to express her concerns.

93. On or about October 18, 2021, PLAINTIFF reached out to the leader of the Goldman Sachs Team to express interest in joining the team.

94. On or about October 18, 2021, PLAINTIFF received an introduction email from Sharma Jitendra regarding an available position with the Goldman Sachs Project Carbon initiative.

95. On or about October 22, 2021, PLAINTIFF was informed that she would be given an opportunity and onboarded with the Goldman Sachs Project Carbon project.

96. However, PLAINTIFF never received any onboarding paperwork for Goldman Sachs Carbon Initiative as promised.

97. On or about November 5, 2021, PLAINTIFF received an email from DEFENDANT EDGERTON confirming that he was involved with the onboarding paperwork and requesting information related to when PLAINTIFF would be in New York.

98. PLAINTIFF confirmed that she would be in New York and would be ready to be onsite for Goldman Sachs. PLAINTIFF also confirmed that she had already spoken to the engagement team regarding the logistics.

99. Nevertheless, PLAINTIFF never received the onboarding paperwork that was promised.

100. PLAINTIFF continued to reach out to the Goldman Sachs' engagement team (Richa Kumar, Jay Nayak, and Sharma Jitendra), who confirmed that PLAINTIFF should have received the paperwork.

101. Nevertheless, DEFENDANTS, EDGERTON, DONNELLY and/or SUMROW, appeared to be refusing to send the documents to PLAINTIFF.

102. As PLAINTIFF'S similarly situated coworkers did not seem to be having the same problems as PLAINTIFF, and were being assigned to clients without issue, PLAINTIFF began to believe that DEFENDANTS did not want to put PLAINTIFF on any projects.

103. On or about November 9, 2021, PLAINTIFF was informed that they placed someone else in the "M&A Integration" role, which PLAINTIFF expressed interest, and that PLAINTIFF would now need to interview for a backfill position.

104. However, on or about November 14, 2021, PLAINTIFF was advised that the backfill role required a "Scrum Master" and "JIRA expert," credentials that PLAINTIFF did not have.

105. PLAINTIFF was set up to fail on this call, received a "bait and switch" from KPMG'S Goldman Sachs team and then DEFENDANT KPMG released PLAINTIFF from the project that evening claiming that Goldman Sachs did not select PLAINTIFF for the position.

106. However, the backfill resource that took PLAINTIFF'S place, was not an "Agile Scrum Master" and was not PMP Certified.

107. The person that replaced PLAINTIFF was a non-African American coworker, who was hired at KPMG and aligned to Financial Services Industry as PLAINTIFF.

108. PLAINTIFF'S background was more extensive than the comparator, who was a woman of East Indian Descent.

109. Plaintiff's newly hired Co-worker in the same Manager role, was given the project over

PLAINTIFF, although PLAINTIFF was PMP Certified and had previously completed IT assessments and created frameworks to develop PMO's for financial services, capital markets and banking clients.

110. Nevertheless, KPMG chose a less experienced Non-African American employee over PLAINTIFF.

111. As such, PLAINTIFF was falsely removed from the project so that KPMG could replace PLAINTIFF with a non-African American employee.

112. PLAINTIFF was also overlooked for another Goldman Sachs engagement at onset of employment in Sept 2021, whereby, a coworker, who started on the same day as Plaintiff was immediately given an opportunity after completing New Hire Onboarding process during 1st week of October 2022.

113. PLAINTIFF became concerned that DEFENDANT KPMG simply did not want to put an African American face on it's (then) available projects – to the detriment of PLAINTIFF.

114. Feeling defeated and that her professional growth and experience at KPMG was being stymied, PLAINTIFF then raised concerns with Head of Diversity, Elena Richards, during a call on November 14, 2021.

115. During this call, PLAINTIFF expressed interest in getting involved with KPMG'S diversity and inclusion initiatives because she expressed that KPMG needed diversity insight given her own experience.

116. When asked to describe her experience at KPMG thus far, PLAINTIFF began to express her frustration about her experiences since joining KPMG, including how she never received her onboarding engagement paperwork from the Goldman Sachs account team.

117. PLAINTIFF expressed that she believed she was being treated in this fashion due to her race/color.

118. After the call, PLAINTIFF was asked to send proof of her experiences, including emails and other communications. PLAINTIFF complied with the request.

119. Then, PLAINTIFF'S concerns were referred to the Ethics & Compliance department for investigation after forwarding her emails and proof.

120. As such, by November 14, 2021, DEFENDANTS were on actual and constructive notice that PLAINTIFF engaged in protected activity, raised concerns about diversity and inclusion issues at KPMG and submitted information to KPMG'S diversity office in support thereof.

121. On or about November 18, 2021, PLAINTIFF followed up with HR to provide them with further emails from DEFENDANT EDGERTON in furtherance of her complaint.

122. PLAINTIFF also raised further concerns about the Goldman Sachs account.

123. PLAINTIFF also reiterated concerns about KPMG'S hiring practices because PLAINTIFF spoke with other similarly situated new hires and confirmed that PLAINTIFF was being treated differently and not being afforded the same opportunities and support.

124. PLAINTIFF also forwarded (to Ms. Richards) the communications she had with DEFENDANT MOLITOR, wherein PLAINTIFF was expressing concerns about diversity practices at KPMG and DEFENDANT MOLITOR advised PLAINTIFF that PLAINTIFF "*could leave KPMG if she was unhappy and did not want to remain with KPMG.*"

125. PLAINTIFF never told anyone at KPMG, including DEFENDANT MOLITOR, that she wanted to leave or resign from KPMG.

126. DEFENDANT MOLITOR'S statement to PLAINTIFF, that PLAINTIFF could leave KPMG, was designed to dissuade PLAINTIFF, and/or any others with similar

complaints, from engaging in protected activity.

127.   PLAINTIFF saw DEFENDANT MOLITOR'S comment as a subtle threat against PLAINTIFF'S employment and/or retaliation and expressed her concerns about this to Ms. Richards as well.

128.   On or about November 18, 2021, PLAINTIFF received an email from Ms. Richards stating that PLAINTIFF'S concerns and emails were being referred to the Ethics & Compliance department and that an investigation was (allegedly) being opened.

129.   Pursuant to this (alleged) investigation, on November 22, 2021, PLAINTIFF had an initial call with DEFENDANT GARCIA – Legal counsel for/at KPMG – about her discrimination and diversity concerns.

130.   Between November 22, 2021 and December 20, 2021, PLAINTIFF followed up with DEFENDANT GARCIA on several occasions and complained that she was being blocked from being placed on financial services engagements.

131.   Indeed, after PLAINTIFF'S discrimination and/or diversity complaint, PLAINTIFF recognized that the environment became even more closed off and hostile to PLAINTIFF.

132.   Among other things, PLAINTIFF complained that each time she corresponded with the TD HR Team for assignments, they would start sending only internal non-billable engagements.

133.   Indeed, after PLAINTIFF complained about discrimination and diversity, DEFENDANTS began to make perfunctory suggestions to PLAINTIFF about projects that were available. However, many of the projects now being suggested to PLAINTIFF were non-Financial Services projects.

134.   As such, PLAINTIFF was being retaliated against and singled-out for these assignments

that were unrelated to her role in FS and were unlike the assignments given to, and handled by, her similarly situated coworkers in FS.

135.   DEFENDANTS seemed to stop (allegedly) suggesting PLAINTIFF for available roles related to Financial Services altogether.

136.   PLAINTIFF also complained that the Regional Managers (such as DEFENDANT DONNELLY) would only submit PLAINTIFF to proposal bidding wherein PLAINTIFF was constantly left on the sidelines and not given fair opportunities.

137.   PLAINTIFF reiterated many times that she wanted to be treated fairly and given an equal chance as her similarly situated coworkers.

138.   During the (alleged) investigation and following her engagement in protected activity, PLAINTIFF began to feel trapped, undermined and devalued by her peers and DEFENDANT managers.

139.   PLAINTIFF would constantly raise concerns regarding discrimination and retaliation during the investigation and would be ignored about her follow up complaints.

140.   PLAINTIFF repeatedly requested to be realigned with her group and to have more involvement, but was refused by DEFENDANT MOLITOR and other leadership in the TD group.

141.   Upon information and belief, the investigation continued through January 27, 2022, when PLAINTIFF reached out to raise yet another Retaliation concern regarding Resource Management DEFENDANTS.

142.   PLAINTIFF complained about now being excluded from the on-site annual advisory training, in retaliation, although she signed up in October 2021.

143.   PLAINTIFF believed that this was a form of retaliation because she made a discrimination complaint and PLAINTIFF believed, based on her direct observations,

DEFENDANTS were now all working together to make sure that PLAINTIFF would be terminated.

144.    It became obvious to PLAINTIFF following her complaint that her employment at KPMG was in jeopardy.

145.    PLAINTIFF was subjected to a retaliatory hostile work environment that was permeated with differential treatment, unfair assignments, lack of assignments, isolation, lack of communication and lack of responses to her ongoing complaints.

146.    At no time during PLAINTIFF'S employment at KPMG did DEFENDANTS attempt to quell PLAINTIFF'S concerns or provide PLAINTIFF with the fair opportunities she sought.

147.    Indeed, after her complaint, PLAINTIFF became even more isolated by KPMG DEFENDANTS and was removed even further from projects and available work.

148.    On the very same day as PLAINTIFF'S retaliation complaint on January 27, 2022, **<u>within an hour</u>**, PLAINTIFF received an email from DEFENDANT YVONNE GARCIA who immediately advised PLAINTIFF that KPMG could not substantiate PLAINTIFF'S claims of discrimination.

149.    PLAINTIFF'S subsequent complaint(s), including her complaint from January 27, 2022, went unanswered and were ignored by DEFENDANTS, GARCIA and/or KPMG.

150.    On the next day, January 28, 2022, PLAINTIFF received a purported *Let's connect"* meeting request from DEFENDANT PHELPS.

151.    During KPMG'S investigation into PLAINTIFF'S complaint, PLAINTIFF complained and raised concerns to DEFENDANT PHELPS about the hostile work environment, discrimination and retaliation.

152.    PLAINTIFF was of the belief that DEFENDANT PHELPS wanted to discuss her

diversity concerns with her now that KPMG'S investigation was concluded.

153.   However, when PLAINTIFF logged in for the meeting with DEFENDANT PHELPS, there was an HR representative on the phone with DEFENDANT PHELPS.

154.   DEFENDANT PHELPS then advised PLAINTIFF that she was being terminated from KPMG for (allegedly) rejecting projects.

155.   **Within less than 24 hours of the end of KPMG'S (alleged) investigation into PLAINTIFF'S complaints, PLAINTIFF was immediately terminated.**

156.   **Clearly, causation between PLAINTIFF'S complaint and her wrongful retaliatory termination is absolute.**

157.   KPMG DEFENDANTS' claim that PLAINTIFF was rejecting work was pretextual, absurd and wholly untrue.

158.   At all times, KPMG DEFENDANTS were well aware that PLAINTIFF continued to beg for equal treatment and work assignments to no avail.

159.   At all times, KPMG DEFENDANTS knew that PLAINTIFF made a complaint of discrimination due, specifically, to the lack of work and manner in which she was being kept therefrom by DEFENDANTS.

160.   KPMG'S assertion that PLAINTIFF was rejecting work and should be fired for same was humiliating and outrageous.

161.   It was clear that KPMG DEFENDANTS intended to humiliate PLAINTIFF for her complaints by wrongfully terminating PLAINTIFF for the very conduct about which PLAINTIFF complained.

162.   In direct response to PLAINTIFF'S complaints, KPMG DEFENDANTS decided that they would dismiss her complaint (about lack of work and assignments) outright, then wrongfully terminate her for (allegedly) rejecting work assignments.

163. Clearly, PLAINTIFF was being taunted and humiliated for complaining.

164. To add insult to injury, KPMG DEFENDANTS wrongfully terminated PLAINTIFF from her employment within 24 short hours of ending her investigation and dismissing her complaints.

165. At no time before dismissing PLAINTIFF'S complaints did KPMG attempt to meet with PLAINTIFF to determine how her complaints and concerns could be addressed.

166. If, indeed, PLAINTIFF was not being subjected to discriminatory practices at KPMG, KPMG DEFENDANTS could have met with PLAINTIFF to address her concerns about the work environment. KPMG DEFENDANT refused to do so.

167. If, indeed, PLAINTIFF was not being subjected to discriminatory practices at KPMG, KPMG DEFENDANTS could have offered explanations to PLAINTIFF about her concerns about lack of placement on projects and accounts.

168. KPMG offered PLAINTIFF no reason or explanation for PLAINTIFF'S claims of differential treatment and discrimination. Instead, PLAINTIFF was terminated.

169. KPMG DEFENDANTS did not have a good faith business justification for their [mis]treatment of PLAINTIFF.

170. KPMG DEFENDANTS did not provide PLAINTIFF with any response to her complaint(s) because there was no alternate explanation to provide. PLAINTIFF was, in fact, being treated differently, being isolated and prevented from TD projects and KPMG DEFENDANTS were upset with PLAINTIFF for exposing their discriminatory practices.

171. On or about January 28, 2022, PLAINTIFF wrote an email complaint to DEFENDANT WYATT seeking a review of her wrongful termination and making it clear that she was terminated in retaliation for protected activity.

172. Specifically, in her January 28, 2022 email, PLAINTIFF wrote to DEFENDANT

WYATT:

> I am very dismayed regarding the decision to release me after I raised concerns with HR and an E&C matter was reviewed regarding my concerns and have been wrongfully terminated.

> I am requesting an opportunity to file for arbitration… Who is the arbitrating firm for KPMG?

173. In response, DEFENDANT WYATT wrote:

> Coretta –

> I wanted to acknowledge that I received your email below as well as the other email you sent over the weekend. I also received your voice message.

> You did not sign an arbitration agreement in connection with your KPMG employment so any concerns you may have would not be subject to arbitration. Further, as Tim and I discussed with you on Friday, this separation decision was made only after careful consideration. The decision is final and there is no appeal process.

> I recognize that you disagree with the action the firm has taken, but please understand that the decision was not in any way related to your ethics and compliance matter.

174. Though PLAINTIFF'S last day of work was designated by KPMG as February 11, 2022, and PLAINTIFF was still actively employed at KPMG at the time of her retaliation complaint, on January 28, 2022, DEFENDANT WYATT *did not* forward PLAINTIFF'S complaint about retaliation to HR for investigation or review and WYATT did not investigate the complaint either.

175. Clearly, PLAINTIFF was seeking arbitration or a review of the wrongful termination, which DEFENDANT WYATT ignored and outright rejected.

176. Indeed, DEFENDANT WYATT made a summary determination that PLAINTIFF'S retaliation complaint had no merit and ignored same.

177. DEFENDANT WYATT did not forward PLAINTIFF'S retaliation complaint to anyone to review.

178.  Upon information and belief, DEFENDANT KPMG had a purported "*zero tolerance*" policy regarding discrimination and retaliation in the workplace, which forbid the types of discriminatory conduct asserted against PLAINTIFF herein.

179.  Pursuant to their purported "*zero tolerance*" policy, PLAINTIFF was supposed to be freely allowed and encouraged to address her concerns with HR and to report any and all instances of discrimination without the fear of retaliation.

180.  Nevertheless, PLAINTIFF was retaliated against and terminated for engaging in protected activity.

181.  KPMG DEFENDANTS' anti-discrimination policies were futile and/or not taken seriously by COLLECTIVE DEFENDANTS.

182.  KPMG'S conduct against PLAINTIFF is of the type that would dissuade anyone from making complaints of discrimination and retaliation at KPMG.

183.  PLAINTIFF was terminated in the manner alleged in this Complaint to send a direct message to KPMG employees to not engage in similar protected activity at KPMG.

184.  From the outset, PLAINTIFF was being set up to fail in her employment at KPMG for discriminatory reasons.

185.  PLAINTIFF was treated "less well" than her similarly situated counterparts.

186.  COLLECTIVE DEFENDANTS supported, condoned, ratified, and approved of the racially-hostile work environment at KPMG against PLAINTIFF.

187.  Despite KPMG'S antidiscrimination policies, COLLECTIVE DEFENDANTS allow(ed) an environment to exist that was permeated with differential treatment other unlawful acts against its African American and/or Black employees (including PLAINTIFF).

188.  Despite the clear language of their policies, DEFENDANTS allow an environment to exist wherein the complainer is retaliated against and is attacked with adverse

employment actions for complaining about discrimination in the workplace.

189. But for PLAINTIFF'S race/color, PLAINTIFF would not have been subjected to the abusive treatment outlined herein.

190. In addition and/or in the alternative, DEFENDANTS' conduct against PLAINTIFF was motivated in part or in whole upon her race/color and engagement in protected activity.

191. INDIVIDUAL DEFENDANTS were each acting pursuant to their employments as agents, employees and representatives of their Principal, DEFENDANT KPMG.

192. DEFENDANTS, their employees, agents, representatives and/or subordinates had no good faith business justification for their individual and collective actions against PLAINTIFF.

193. DEFENDANTS' actions and conduct were intentional, grossly negligent, and intended to harm PLAINTIFF.

194. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, suffered mental and emotional distress, experienced loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress.

195. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

196. COLLECTIVE DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

197. Punitive damages are warranted against COLLECTIVE DEFENDANTS individually and collectively.

### AS A FIRST CAUSE OF ACTION
### <u>FOR DISCRIMINATION UNDER TITLE VII</u>
### *(Against Defendant KPMG)*

198. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

199. This claim is authorized and instituted pursuant to the provisions of <u>Title VII</u> of the Civil Rights Act of 1964, <u>42 U.S.C</u>. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of DEFENDANT KPMG.

200. PLAINTIFF complains of DEFENDANT KPMG'S violation of <u>Title VII'S</u> prohibition against discrimination in employment based, in whole or in part, upon an employee's race/color.

201. DEFENDANT KPMG engaged in unlawful employment practices prohibited by <u>42 U.S.C</u>. § 2000e *et seq*., by discriminating against PLAINTIFF because of her race/color.

202. PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT KPMG.

203. PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias against African American employees and those that engaged in protected activity.

204. PLAINTIFF complained about the discriminatory abuse she faced at the hands of her managers and said complaint(s) were ignored. Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment, adverse employment action and other unreasonable acts

205. PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above describe protected activity and for seeking equal treatment under the laws as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

206. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

207. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

208. At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

209. Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

210. DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

211. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

212. Collective KPMG DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following her engagement in protected activity.

213. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

214. DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and owner DEFENDANTS.

215. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety,

27

embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

216. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

217. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A SECOND CAUSE OF ACTION**
**FOR *RETALIATION* UNDER TITLE VII**
*(Against Defendant KPMG)*

218. PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

219. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

220. DEFENDANTS engaged in unlawful employment practice prohibited by 42 U.S.C. § 2000e *et seq*., by discriminating against PLAINTIFF with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of DEFENDANT KPMG.

221. PLAINTIFF complained about the discriminatory abuse she faced at the hands of her managers and coworkers and said complaints were ignored.

222. Instead, PLAINTIFF was further subjected to retaliatory conduct immediately in response to her complaints.

223. Further, all of PLAINTIFF'S follow up complaints concerning retaliation were outright ignored.

224. PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

225. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

226. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

227. At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

228. Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

229. DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

230. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

231. DEFENDANTS KPMG had no valid business justification for the retaliatory actions taken against PLAINTIFF for her engagement in protected activity.

232. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

233. DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and DEFENDANTS.

234. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

235. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

236. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A THIRD CAUSE OF ACTION**
**FOR *DISCRIMINATION* UNDER *42 U.S.C.* § 1981 *(As Amended)***
*(Against All DEFENDANTS Collectively and Individually)*

237. PLAINTIFF repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

238. *42 U.S.C.* § 1981 states in relevant part as follows:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination

of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 .S.C. §1981

239.   PLAINTIFF, who is African American/Black, was discriminated against, prevented from entering into or performing contracts, denied equal enjoyment of benefits and privileges of employment, and removed from employment because of her race/color as provided under *42 U.S.C.* § 1981 and has suffered damages as set forth herein.

240.   PLAINTIFF was effectively denied full and equal benefit of all laws and immunities as an employee of DEFENDANT KPMG and was denied the right to contract with DEFENDANT KPMG based on her race/color.

241.   PLAINTIFF was subjected to a racially hostile work environment and acts of unlawful discrimination and retaliation at DEFENDANT KPMG by her coworkers, in the presence of and/or with the knowledge of INDIVIDUAL DEFENDANTS.

242.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias, racial animus, and differential treatment against African American employees.

243.   PLAINTIFF complained to DEFENDANT KPMG of the discriminatory abuse she faced at the hands of her coworkers.

244.   DEFENDANT KPMG was aware that PLAINTIFF made these complaints and that PLAINTIFF was being retaliated against for same.

245.   PLAINTIFF was terminated in retaliation for engaging in the above-describe protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

246.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings,

inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

247.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

248.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A FOURTH CAUSE OF ACTION**
**FOR *RETALIATION* UNDER *42 U.S.C.* §1981 (*As Amended*)**
***(Against All Defendants)***

249.   PLAINTIFF repeats, reiterates, and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

250.   By the acts and practices described above, DEFENDANTS retaliated against PLAINTIFF for her opposition to unlawful discrimination under 42 U.S.C. §1981.

251.   DEFENDANTS acted with malice and/or reckless indifference to PLAINTIFF'S statutorily protected rights.

252.   PLAINTIFF, who is African American/Black, was discriminated against, prevented from entering into or performing contracts, denied equal enjoyment of benefits and privileges of employment, and removed from employment because of her race/color as provided under *42 U.S.C.* § 1981 and has suffered damages as set forth herein.

253.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias against African American PLAINTIFF.

254.   PLAINTIFF was subjected to a racially hostile work environment and acts of unlawful discrimination and retaliation at DEFENDANT KPMG by her managers and coworkers,

in the presence of and/or with the knowledge of DEFENDANT KPMG.

255.    PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias and adverse employment actions.

256.    PLAINTIFF complained to KPMG DEFENDANTS about the discriminatory abuse she faced at the hands of Her management and/or coworkers.

257.    DEFENDANT KPMG was aware that PLAINTIFF made these complaints and that PLAINTIFF was being retaliated against for same.

258.    PLAINTIFF was terminated in retaliation for engaging in the above-describe protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

259.    As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

260.    COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

261.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A FIFTH CAUSE OF ACTION FOR *DISCRIMINATION*
UNDER NEW YORK STATE EXECUTIVE LAW**
(*Against DEFENDANT KPMG*)

262.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

263. <u>New York State Executive Law</u> §296 provides that,

> 1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, … to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

264. PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT KPMG.

265. PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias against African American employees and those that engaged in protected activity.

266. PLAINTIFF complained about the discriminatory abuse she faced at the hands of her managers and said complaint(s) were ignored. Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment, adverse employment action and other unreasonable acts.

267. PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above describe protected activity and for seeking equal treatment under the laws as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

268. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

269. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

270. At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

271. Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

272.   DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

273.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

274.   Collective KPMG DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following her engagement in protected activity.

275.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

276.   DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and owner DEFENDANTS.

277.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

278.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

279.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A SIXTH CAUSE OF ACTION FOR *RETALIATION* UNDER NEW YORK STATE EXECUTIVE LAW (*Against DEFENDANT KPMG*)

280. PLAINTIFF repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

281. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

282. PLAINTIFF complained about the discriminatory abuse she faced at the hands of her managers and coworkers and said complaints were ignored.

283. Instead, PLAINTIFF was further subjected to retaliatory conduct immediately in response to her complaints.

284. Further, all of PLAINTIFF'S follow up complaints concerning retaliation were outright ignored.

285. PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above-describe protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

286. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

287. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

288. At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially hostile work environment and took no action to abate or correct same.

289. Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as

PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

290. DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

291. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

292. DEFENDANT KPMG had no valid business justification for the retaliatory actions taken against PLAINTIFF for her engagement in protected activity.

293. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

294. DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and DEFENDANTS.

295. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

296. COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

297. PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A SEVENTH CAUSE OF ACTION FOR *DISCRIMINATION/RETALIATION* <u>UNDER NEW YORK STATE EXECUTIVE LAW</u>
*("Aider And Abettor" Liability Against All INDIVIDUAL DEFENDANTS* DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, and PHELPS)

298.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

299.    <u>New York State Executive Law</u> §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to **aid, abet,** incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

300.    INDIVIDUAL DEFENDANTS, DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, and PHELPS, engaged in an unlawful discriminatory practices in violation of <u>New York State Executive Law</u> §296(6) by **aiding, abetting**, inciting, compelling and coercing the discriminatory and retaliatory conduct of their principal, DEFENDANT KPMG.

301.    PLAINTIFF was subjected to acts of unlawful discrimination and retaliation at DEFENDANTS KPMG by her managers/coworkers, in the presence of and/or with the knowledge of INDIVIDUAL DEFENDANT MANAGERS DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, and PHELPS.

302.    PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias and adverse employment actions against African American employees, specifically PLAINTIFF.

303.    Once PLAINTIFF complained to DEFENDANTS of the discriminatory abuse she faced at the hands of her coworkers/managers, PLAINTIFF wrongfully terminated KPMG in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

304.   PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT KPMG.

305.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias and adverse employment actions against African American PLAINTIFF.

306.   PLAINTIFF complained about the discriminatory abuse she faced at the hands of her coworkers/managers and said complaint(s) were ignored.

307.   Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment, termination, adverse employment action and other unreasonable acts.

308.   PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above describe protected activity and for seeking equal treatment under the laws as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

309.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

310.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

311.   At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

312.   Instead, KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

313.   DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

314.   But for INDIVIDUAL DEFENDANTS' respective positions at KPMG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged

above.

315.   COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following her engagement in protected activity.

316.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

317.   DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and owner DEFENDANTS.

318.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

319.   COLLECTIVE DEFENDANTS conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

320.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS AN EIGHTH CAUSE OF ACTION FOR *DISCRIMINATION*
VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**

321.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

322.   The *New York City Administrative Code* § 8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer
> or an employee or agent thereof, because of the actual or perceived
> . . . race/color . . . to refuse to hire or employ or to bar or to

discharge from employment such person or to discriminate against
such person in compensation or in terms, conditions or privileges
of employment.

323.   DEFENDANTS engaged in an unlawful discriminatory practice in violation of *New York
City Administrative Code* § 8-107(1)(a) by creating and maintaining discriminatory
working conditions, and otherwise discriminating against PLAINTIFF because of her
race/color.

324.   PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT KPMG.

325.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was
permeated with racial bias against African American employees and those that engaged
in protected activity.

326.   PLAINTIFF complained about the discriminatory abuse she faced at the hands of her
managers and said complaint(s) were ignored.

327.   Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment,
adverse employment action and other unreasonable acts.

328.   PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above
describe protected activity and for seeking equal treatment under the laws as well as
under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

329.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

330.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT
KPMG.

331.   At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice
of its racially hostile work environment and took no action to abate or correct same.

332.   Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as
PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape

discipline with impunity.

333.   DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

334.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

335.   Collective KPMG DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following her engagement in protected activity.

336.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

337.   DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and owner DEFENDANTS.

338.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

339.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

340.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A NINTH CAUSE OF ACTION FOR RETALIATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

341.  PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

342.  The *New York City Administrative Code* § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

343.  DEFENDANTS engaged in an unlawful discriminatory practice in violation of *New York City Administrative Code* § 8-107(7) by discriminating against PLAINTIFF because of PLAINTIFF'S opposition to the unlawful employment practices of KPMG DEFENDANTS.

344.  PLAINTIFF complained about the discriminatory abuse she faced at the hands of her managers and coworkers and said complaints were ignored.

345.  Instead, PLAINTIFF was further subjected to retaliatory conduct immediately in response to her complaints.

346.  Further, all of PLAINTIFF'S follow up complaints concerning retaliation were outright ignored.

347.  PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above-describe protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

348.  DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

349.  Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

350.  At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice

of its racially-hostile work environment and took no action to abate or correct same.

351.   Instead, DEFENDANT KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

352.   DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

353.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT KPMG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

354.   DEFENDANT KPMG had no valid business justification for the retaliatory actions taken against PLAINTIFF for her engagement in protected activity.

355.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

356.   DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and DEFENDANTS.

357.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

358.   COLLECTIVE DEFENDANTS' conduct has been malicious, willful, outrageous, and

conducted with full knowledge of the law.

359.     PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A TENTH CAUSE OF ACTION
### FOR *DISCRIMINATION/RETALIATION* UNDER THE NYCHRL
*(Aider and Abettor Liability Against Individual Defendants DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, and PHELPS)*

360.     PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

361.     The *New York City Administrative Code* § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

362.     DEFENDANTS engaged in an unlawful discriminatory practice in violation of *New York City Administrative Code* § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory and unlawful conduct.

363.     PLAINTIFF was subjected to acts of unlawful discrimination and retaliation at DEFENDANTS KPMG by her managers/coworkers, in the presence of and/or with the knowledge of DEFENDANT MANAGERS, DONNELLY, EDGERTON, MOLITOR, WYATT, GARCIA, and PHELPS.

364.     PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias and adverse employment actions against African American employees, specifically PLAINTIFF.

365.     Once PLAINTIFF complained to DEFENDANTS of the discriminatory abuse she faced at the hands of her coworkers/managers, KPMG wrongfully terminated PLAINTIFF in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

366.   PLAINTIFF was subjected to discrimination and retaliation at DEFENDANT KPMG.

367.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with racial bias and adverse employment actions against African American PLAINTIFF.

368.   PLAINTIFF complained about the discriminatory abuse he faced at the hands of her coworkers/managers and said complaint(s) were ignored. Instead, PLAINTIFF was further subjected to a retaliatory hostile working environment, termination, adverse employment action and other unreasonable acts.

369.   PLAINTIFF was then wrongfully terminated in retaliation for engaging in the above describe protected activity and for seeking equal treatment under the laws as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT KPMG.

370.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

371.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT KPMG.

372.   At all times, DEFENDANT KPMG was aware and/or had actual and constructive notice of its racially-hostile work environment and took no action to abate or correct same.

373.   Instead, KPMG attacked and retaliated against individuals, such as PLAINTIFF, who engaged in protected activity while allowing the perpetrators to escape discipline with impunity.

374.   DEFENDANT KPMG'S purported anti-discrimination and anti-retaliation policies were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

375.   But for INDIVIDUAL DEFENDANTS' respective positions at KPMG, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged

above.

376.   COLLECTIVE DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following her engagement in protected activity.

377.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

378.   DEFENDANT KPMG is strictly liable for the conduct of its supervisors, managers and owner DEFENDANTS.

379.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of her rights, mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, loss of employment, loss of employment benefits, loss of employment opportunities, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. PLAINTIFF has also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life and other non-pecuniary losses.

380.   COLLECTIVE DEFENDANTS conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

381.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## **JURY DEMAND**

382.   PLAINTIFF demands a jury trial on all issues to be tried.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against COLLECTIVE DEFENDANTS:

A.   Declaring that DEFENDANTS engaged in unlawful employment practices prohibited by 42 U.S.C.§1981, Title VII, the NYCHRL, and the NYSHRL in that DEFENDANTS

discriminated against PLAINTIFF on the basis of her race/color and retaliated against PLAINTIFF for complaining of discrimination;

B.  Awarding damages to PLAINTIFF for all lost wages and benefits resulting from DEFENDANTS' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding PLAINTIFF compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

**D.  Reinstating PLAINTIFF to her former position as authorized and required under Title VII, the NYSHRL and NYCHRL;**

E.  Awarding PLAINTIFF punitive damages;

F.  Awarding PLAINTIFF attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G.  Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just and proper to remedy DEFENDANTS' unlawful employment practices.

Dated: New York, New York
       August 30, 2022

**PHILLIPS & ASSOCIATES,**
**Attorneys at Law, PLLC**
**/S/**

By:  _____

Gregory Calliste, Jr., Esq. &
Alexandria Jean Pierre
*Attorneys for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901 - 2107
gcalliste@tpglaws.com